The next case is number 2010-1541, QVD Food Company v. United States. Mr. Pardo. Thank you, Morning. As we've argued in our brief, we believe that the Department of Commerce's refusal to consider the FAO study in deciding the surrogate value for whole fish was both contrary to law and the record evidence in this case. Under the statute, Commerce has an obligation when selecting surrogate values to choose the best available information. Best, by definition, is a term of comparison. Thus, it requires a fair and equal consideration of all available options. In order to satisfy this legal obligation, Commerce has adopted certain surrogate value criteria in which they use to view and vet the available surrogate values. Among these criteria are whether the surrogate value is contemporaneous with the PLR, whether it is broad-based, and whether it is specific to the input that is being valued. It does strike me as a little unusual that Commerce would introduce that study into the record and request comments, and then say, well, but we don't have enough time to consider it. So I understand that part of your argument. Now, the flip side, as I understand, is that, well, yeah, we introduced it. We learned of it. We introduced it. We asked for comments. When we realized that there were objections and there were issues, we realized that this is something that couldn't be vetted and therefore couldn't be taken into account. Why is that unreasonable? Well, Your Honor, it's unreasonable because, again, the agency does have a requirement under the statute to use the best available information. Is there a requirement that they get this done by these deadlines, or could they have taken another two or three weeks if they wanted to? Certainly, they operate under a statutory deadline. However, I would submit, Your Honor, that Commerce was fully aware of its own statutory deadline when the agency itself placed the FAO study on the record. Moreover, after rejecting it in this case, Commerce made the unprecedented statement that they found the FAO study so worthy of further consideration that they were going to place it on the record in all ongoing and subsequent proceedings in this fish fillet case. Now, significantly, the surrogate value that they did use to value whole fish in our proceeding, the 2000-2001 got you high to statement. Commerce made no such statement. They found that this is such a meritorious surrogate value that we will place this on the record. So the clear implication there is that Commerce, even at this point, knew that this was a better surrogate value. And most significantly, three months after the decision, in our case, in a new shipper review final, Commerce, again, had the choice between these two same surrogate values and decided at that point that the FAO study, as they said, better satisfied their surrogate value criteria. Now, most significantly, in making that decision in the new shipper review, a mere three months later, Commerce did not go beyond the four corners of this 34-page report because clearly within those 34 pages was all the information that Commerce needed to know that this surrogate value source better satisfied its surrogate value criteria since it was far more broad-based, it was far more contemporaneous to the POR, and there was clear indications that FAO, a widely respected agency, had taken precautions to make sure that the information was accurate. They had stated that they had used cross-checking of the information and that they had used trained interviewers in order to confirm that this information was correct. Now, most significantly, Your Honor, our view is if this is the only concern which the agency has with the FAO study is that it felt it did not have time under its administrative deadline, then we submit that the proper recourse at this point is for this Court to remand this issue to Commerce so that it does have ample time to consider this so that it may fulfill its statutory obligation. There is simply no dispute that the FAO study is record evidence, and it is record evidence about the single most important surrogate value on this record. Now, I take it that if they had discovered this study but decided that there wasn't enough time, they discovered it very late in the process, that's my hypothesis, and there wasn't enough time to really vet it adequately, and therefore they didn't, for that reason, introduce it into the record, there would be no argument that that was an abuse of discretion, correct? Well, Your Honor, we are confined by the record, but that is a very important point, is that there is absolutely no dispute or argument that the FAO study is properly and legitimately part of the record. Okay, but to get back to my question, if they had not put it in the record, there would be no argument that they had abused their discretion by not putting it in the record, correct? If they had not placed it on the record, I would have to agree, Your Honor, that it would not be a piece of record evidence which would be under discussion. So the question is really, should the situation be very different if, for example, they decided, well, we're not sure whether this is reliable, but let's go ahead, put it in the record. If no one objects to it, we can use it. If there's any objection, we'll just say we don't have time to work it through and we won't consider it. Any problem with that? Well, absolutely, Your Honor, because these proceedings, as this Court well knows, are adversarial in nature. So in essence, somebody is always going to have a problem with a piece of information. There is no such thing as a surrogate value. Maybe somebody has an objection that's so frivolous that it's not worth drawing cognizance of. With all due respect, Your Honor, we believe that the objections that were raised were in fact frivolous because to this day there has not been any sort of a clear articulation of what specifically the problem was with this 34-page report and why it is that additional time was necessary since it very clearly spelled out all of the relevant information with respect to the surrogate value criteria that Commerce itself adopts. Could Commerce have withdrawn the report? Could they have submitted it as they did, requested comments as they did, received comments and realized, whoops, this is too late and this is a little bit of a problem, therefore, just simply enter a document in the record, we hereby withdraw this piece of evidence, it's too late, it's too complicated, and remove it from the record? Could they have done that? Your Honor, that raises some interesting legal questions. I'm not certain what their legal authority would be to remove it from the record without cause, but again, with respect, I would say that that's not the situation we face here. It is undisputed that this is on the record, and we believe that given that this is merely a 34-page report and that it clearly states the relevant criteria that Commerce is supposed to look to when determining the best available information, that there is simply no reason for it to say we have insufficient time. And this was confirmed by their very own final determination a mere three months later using nothing more than the report itself. But I hear you concentrating on the FAO report. Are you retaining the position that it was error to use the 2001 figures rather than the ensuing years? Absolutely, Your Honor. With respect to the rejection of the 06-07 Gochihata financial, we believe that this was also an error. As this Court well knows, Commerce is required to have a rational connection between the facts found and the choices that it makes. However, the reasons it gave for rejecting the 06-07 financial statement have absolutely no connection to the one piece of information which was necessary within the 06-07 report, that being the value for Whole Fish there. The widely cited director's report in the 06-07 financial statement for Gochihata talks about financial concerns with respect to cash flow problems and their inability to obtain future financing. However, none of this relates to the sale price from commercial invoices which are reflected for Whole Fish in the company's audited financial statement. As we noted in the brief, the only part of that financial statement which relates specifically or directly to the prices in the commercial invoices is the statement in the notes that sales revenue comports with IAS Rule 18 and one of the requirements there is that amounts of revenue be fixed at fair value. Thus, if there is anything on the record or within that financial report that is indicative of whether this is a market price, it would be that statement. In short, there is simply no information on the record which connects these financial difficulties to a conclusion that this price is anything other than a clear representation of the current market value for Whole Fish. And notably, the Court of International Trade in an earlier proceeding when considering this exact same 2006-2007 financial statement reached the same conclusion and stated that whether or not the company made an overall profit, the revenue and quantity of the sales of fish are market prices and quantities reflected in the audited financial statement. There is simply no additional information on the record in this proceeding which would lead to a contrary result. And of greater concern to us is the fact that having rejected the 2006-2007 financial statement for these reasons, Commerce then used a price from the 2000-2001 financial statement which, as we have noted, the Director's Report shares these identical concerns of inability to get cash flow and the desperate financial situation of the company. So we therefore respectfully submit that it is arbitrary and improper for Commerce to use these financial concerns as the reason for rejecting the far more contemporaneous 06-07 financial statement and resorting to this 2000-2001 statement where it reflects the exact same financial concerns that have been used to reject the better source. Okay. Let's hear from the government. Thank you. I hope it will save you rebuttal time, Mr. Pardo.  Ms. Devine. May it please the Court. The Court and Catfish Farmers earlier in the period of review, the third period of review, did have a different record. In fact, the Court here in QBD's situation did note that the record was different in these two different reviews. So despite the fact that Catfish Farmers, the Court and Catfish Farmers, originally found that Commerce's determination was reasonable in that case, the Court also found that it was reasonable in this case given the different state of the record in that case. If Commerce was not going to consider the FAO study, why did it introduce that study in the record in the first place? Commerce, during the review, noted that there was no perfect price that it could find. And so, therefore, using its independent responsibility, search for information record now found, admittedly found information on the record at a very late date, but at that point had not had a chance to vet it, did not necessarily put it on the record because it knew it was reliable, but that it could possibly serve as a surrogate value. But it did put it in the record. Correct. It did ask for comments. Correct. And it did receive comments and then said, well, I guess we don't have enough time to vet this, so we're not going to consider it. Was Commerce free to disregard it at that point? First of all, Commerce did, in fact, consider the report. It considered the report and considered the responses to the report and determined that in any sort of circumstance it couldn't independently determine it was reliable. It has that responsibility for every piece of evidence that it relies upon in order to support a decision by substantial evidence. Were the time constraints of the statutes and the regulations an impediment to Commerce taking another week or two to vet this? Yes. The statutory requirements are the statutory requirements. Congress put these statutory requirements in the statute in order to ensure that decisions Commerce made were made efficiently and speedily. And Commerce itself noted that procedurally it could not provide the sort of vetting process that it could in that circumstance given the short amount of time, but it was limited by the statute. Commerce was limited by the statute in this case. It has absolutely no discretion to extend those statutory deadlines, so in this case it did the best it could with what it had. Let me ask a follow-up question to Judge Lynn's question. What do you think Commerce would have regarded as a sufficient basis for relying on the evidence that they did put in the record, even at that late date, that they didn't find either from the responses or otherwise? In other words, presumably they put it in the record at least thinking that it was possible that they would rely on it. Correct, possible. What was it that persuaded them that that was not possible? Commerce noted, and this was brought up by the petitioners, noted several problems that the report itself noted, first of all being the fact that there was a question as to documentation. The interviewees were asked for their best estimates as to what they sold their PANGAS for. It wasn't clear the time period. In fact, Commerce mentioned that as well. It wasn't clear the time period that the prices were coming from. There was also problems with interviewees worrying that the interviewers were agents of the police or agencies of the tax authorities. There were problems mentioned specifically in the report that Commerce needed an opportunity to look through and determine whether it was appropriate to rely on the surrogate value as a reliable surrogate value. Now, in the determination that was made a few months later to rely on the report, were those problems worked out? Does Commerce's, I guess it would be in a memo, in a decision, was that discussed, those problems, and was it concluded at that point that those were not insuperable problems? Correct, Your Honor. Commerce subsequently found that it could be considered a reliable piece of information, but of course they had three extra months to look at that data and determine whether it was those problems took away from the reliability of the study. I haven't read the later document. What I'm really looking for is did they address in particular what it was that may have given them qualms initially, but did they ultimately say, well, now we see that this document is reliable and here's why. Well, those same concerns were brought up by the petitioners again in the third New Shippers Review, and Commerce determined that regardless of those particular concerns that petitioners brought up, that it could still rely upon the study at that point because the report itself could conceivably, even though they had these problems, that the report could serve as a reliable surrogate value given the study itself. But was there any indication that any of these conclusions were reached based on new information or further review during that three-month period? There was no information indicated on the record, but Commerce did have more time to look at these concerns and determine that the petitioners' concerns were not sufficient to make this report unreliable. All right. Thank you. But on the face of that information, which shows a clear annual reduction in the price from $68 to $50 to $49 to $48 each year, to $55 to $45, down to $40, on its face it seems as if the decision of Commerce to ignore all of this and to require the $68 plus an increase for inflation is more than a simple administrative decision, don't bother us with this tardy information. It's so directly contrary to their results that it seems very strange to be justifying the refusal even to look at those results. The results of the FAO report or the results of the overall... The information which came before Commerce at that point, which had been pointed out by the petitioners... Commerce is not required to rely upon data it's considered to be unreliable or cannot rely upon. They're not required to rely on anything, but they are absolutely required to use the best available data. Correct. And if the data that they are presented is unreliable, they cannot use that data, no matter how much data... No one says it's unreliable. They went back to 2001 and said, these are the data we're going to use, never mind that everything in the record impeaches those data. Correct, but the data from... The following data, the data from 2002 to 2004, from the Gatchihata statements, every party in the proceedings determined those records or those numbers to be unreliable, and for Commerce to be required to consider evidence that the parties themselves determined to be unreliable, there's no requirement that Commerce would do such a thing. Commerce is required to rely on reliable evidence, and the 2000-2001 numbers had already been determined to be unreliable. They're required to use the best available information. Correct. These are critically different sums, depending on what you look at. Correct, but these numbers were not considered by Commerce to be reliable. So therefore, the fact that these... They didn't say they were unreliable. They said, we're not going to consider them. Commerce had determined that these numbers, and no parties actually argued that these particular numbers should be used as surrogate values, because as the Court of International Trade... They didn't say that the FAO conducted a flawed study. Correct, but Commerce determined that it could not determine it to be reliable at that point. So therefore, the fact that Commerce is required to do its own reliability determination couldn't rely on information that it had not deemed to be reliable. It's its own independent, overarching responsibility for the agency. In the circumstances of this case, where the study was introduced in the record, and then Commerce came to the conclusion that it couldn't be vetted, there wasn't enough time. Correct. But then Commerce, very shortly thereafter, concluded that the study was reliable and could be used and was far more accurate, given the unfairness in the difference in the result that would follow if the FAO study were followed. Is there anything that would foreclose or prohibit Commerce from revisiting this issue, in this case, voluntarily? Commerce cannot voluntarily extend the statute. It is required to make a determination within a certain statutory period of time. So we can't go back three months later and say, oh, you know, we have better information, so we want to just make an adjustment. No, Your Honor. Then why do we have judicial review? In this particular case? In any case, in any such case, of the added-upping determinations. Why do you have judicial review given the statutory deadlines? I have judicial review to correct errors. Correct. In this circumstance, it wasn't here. So that's our inquiry. Was there an error? Was there an error of Commerce? There was no error of Commerce in determining that it did not have sufficient data. I realize that's the position, and it is very hard to reconcile with the data that have been accepted as reliable. The data that has been accepted as reliable? In the FAO report. In the FAO report, subsequently in the third New Shippers Review. And also, as I recall, the ensuing data for review have not been challenged as incorrect. I'm sorry, I'm misunderstanding which data you're – there are so many pieces of data. The prices since 2001. The prices since 2001 were not determined to be reliable. No party requested for them to be determined to be reliable. The FAO determined. The FAO determined? I'm not sure I understand. The FAO – Did you read the Petitioner's Brief? Yes. Thank you. The Appellant's Brief. As discussed above, the following values are on the record for the Department's consideration of the whole fish surrogate value for the final results. 2000 to 2001, 68 takas. 2001 to 2002, 50 takas. 2002 to 3, 49.7. 2003 to 4, 48. The next year, 55, 45, 42. And 2007, 40. And on that background, Commerce chose the 68 figure of 2000 and 2001. Although, according to what we've been told, none of these other figures has been challenged as incorrect. If Commerce is required to use the best available data, I'm trying to understand how that result can be justified, with all deference to the agency charged with this activity. The data itself was determined by Commerce to be unreliable, so therefore – It was determined two months later that it was reliable. It was just not – it was admitted into the record. They said we didn't have time to get to it. They didn't say it was unreliable. They said we're not going to rely on it. Correct. There's a difference, is there not? True. A significant difference, I would think. Well, if it's not reliable, if they can't rely upon it, conceivably it would be considered unreliable. Unreliability seems to have some kind of loaded term, but in this circumstance, Commerce could not rely upon the FAO report, did not have the adequate opportunity to determine it was reliable, had this responsibility, therefore it could not rely on the FAO report to show that pricing trend. I'm a little confused now, I'm afraid. Straighten me out. I thought the FAO report recited the price for 2007, correct? The FAO report reported the price from 2005 to 2006, so I believe it was October 15th, 2005 to April 15th, 2006. Okay, but nothing – the prices for the periods before that were not out of the FAO report? Correct. They came from some other source, right? Correct. Go ahead. Go ahead. I was going to say that evidence came from evidence that Commerce determined to be unreliable. Okay. Your Honor, I would also like to address the ministerial error issue. Commerce has the discretion to determine what a ministerial error is, and it involves a substantive determination in lining up prices to determine whether prices actually line up with each other, and it's not necessarily just a math error. And so in this case, the question of whether there was double counting going on had to do with the lining up of prices in Commerce's substantive determination and not just a simple inadvertent math error. And for these reasons, we respectfully request that the Court affirm the decisions of the Court of International Trade. Thank you, Mr. Vine. Mr. Pardo, perhaps you can shed some light on these numbers. I will try, Your Honor. Thank you. To begin with, as Your Honor stated, one of the most significant facts here is that nowhere on the record did Commerce say the FAO study was unreliable. They simply did not rely upon it. And as Your Honor stated, there is a significant difference there. Moreover, there is additional record evidence on other fish prices which Commerce is not considering. While they did state that some of the earlier gotcha-hotta financial statements were not reliable, the record, as the chart Your Honor was quoting from, also shows that on the record was the 2004 study from the Agricultural Development Bank. We have the 2007 FAO study. And we also have a 2007 price quote from a company called Bangladesh Catfish Limited. All of these prices, again, confirm the very steady and consistent decline in the price of whole fish from the 2000-2001 period to the POR. And Commerce has wholly disregarded this record evidence in choosing not only the oldest but the highest surrogate value on the record for fish. And then to add insult to injury, it took this price of 68 takas and then inflated it an additional 44 percent to a price of almost 98 takas per kilo because it has a general presumption that older values must be inflated to the contemporaneous POR period under a general presumption that all prices increase over time. Well, this general presumption cannot be made in disregard of basic record evidence, which is clear that in this case, for this one input, the price is not rising. The price is not, in fact, even remaining steady. The price is declining. And in prior cases where the record has shown that an individual input is not rising at the same level as the standard WPI or CPI-based inflator, which Commerce uses, it has used a product-specific inflator in order to adjust the price. In this case, we believe the record is abundantly clear that there is absolutely no rational basis for Commerce to be using a WPI-based inflator and inflating this oldest and highest surrogate value, an additional 44 percent, to now reach a price which is more than double what the contemporaneous values for whole fish show, simply because it has a general presumption which it's using in disregard of record evidence within this proceeding. As Your Honor, Judge Newman stated, again, the fundamental issue here is Commerce's obligation under the statute to use the best available information. And best, as we've stated in our brief, is clearly a term of comparison. Commerce cannot just simply set aside one of the most significant surrogate values on the record and look at a subset of what is available and say, we've selected this one, therefore we find it's the best. And as the Court of International Trade stated in Union Camp, to do so under any situation means that whatever their selection of a surrogate value is, is not supported by substantial record evidence, since they have failed to consider the record as a whole. While we agree that Commerce is under statutory time limits, again, we believe then the proper recourse in this situation then is for this issue, at least with respect to the use of the FAO study, be remanded back to Commerce at this point where the statutory time limit is no longer a constraint, so that they may fulfill what all parties acknowledge is their obligation under the statute, to use the best available information, which can only be determined by application of the surrogate value criteria, equally and fairly among all of the available options. Okay. Thank you, Mr. Pardo. Can I ask just one further question? Sure. And I didn't want to use up your time because this really isn't directly pertinent to the legal issues here. But it struck me as unusual to have an anti-dumping duty this low that would seem to, I mean, normally we're looking at 10, 20, 30% anti-dumping duties, which obviously have a big impact on everyone. Yes. But one half of 1% is very low. Is there something else other than the monetary amount of the duty that's going on here? There is absolutely, Your Honor. To the extent that you can tell me. I can tell you very succinctly. Under Commerce's regulations, a company may be excluded from an anti-dumping duty case permanently if they successfully receive 3-0 or de minimis results in a row. I understand. And we are now at .52. Therefore, by the use of this, and QDD has already, this is the only obstacle in the way of QDD's 3-0s. Okay. It's three one-hundredths of a percentage point in dumping, which is why we are here. I understand. Thank you, Your Honor. Thank you. Okay. Thank you, Mr. Pardo and Mr. Dunn. The case is taken under submission.